USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/11/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
PATRICIA PAMELA SHAW,                    :
                                         :
              Plaintiff,                 :
                                         :          **OPINION & ORDER**
                                         :
      -against-                          :          20-CV-5123 (JLC)
                                         :
KILOLO KIJAKAZI,[1]                      :
Acting Commissioner, Social Security     :
Administration,                          :
                                         :
              Defendant.                 :
                                         :
------------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

Plaintiff Patricia Pamela Shaw seeks judicial review of a final determination by defendant Kilolo Kijakazi, the Acting Commissioner of the Social Security Administration, denying Shaw's application for disability insurance benefits under the Social Security Act.  The parties have cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  For the reasons set forth below, Shaw's motion is granted, the Commissioner's cross-motion is denied, and the case is remanded for further administrative proceedings.

---

[1] Kilolo Kijakazi is now the Acting Commissioner of the Social Security Administration.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is substituted for Commissioner Andrew Saul as the defendant in this action.

1

# I. BACKGROUND

## A. Procedural Background

On January 9, 2017, Patricia Pamela Shaw filed an application for Title II

Disability Insurance Benefits. Administrative Record ("AR"), Dkt. No. 14, at 17.[2]

She alleged an onset disability date of September 21, 2015 due to lower back injury,

knee injury, and thigh injury. *Id.* at 51. On March 21, 2017, Shaw's initial

application was denied. *Id.* at 17. On August 29, 2017, Shaw requested a hearing

before an Administrative Law Judge ("ALJ") and, more than two years later, on

October 15, 2019, a hearing was held before ALJ JuanCarlos Hunt. *Id.* In a

decision dated December 4, 2019, the ALJ concluded that Shaw was not disabled.

*Id.* at 19–30. Shaw sought review of the ALJ's decision by the Appeals Council, but

that request was denied on May 1, 2020. *Id.* at 1–4.

Shaw timely commenced the present action on July 4, 2020, seeking judicial

review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). Complaint,

Dkt. No. 1. The Commissioner answered Shaw's complaint by filing the

administrative record on December 28, 2020. Dkt. No. 14. On February 26, 2021,

Shaw moved for judgment on the pleadings seeking remand for further

administrative proceedings and submitted a memorandum of law in support of her

motion. Motion for Judgment on the Pleadings, Dkt. No. 15; Plaintiff's

Memorandum of Law in Support of Plaintiff's Motion for Judgment on the

---

[2] The page numbers refer to the sequential numbering of the Administrative Record
provided on the bottom right corner of the page, not the numbers produced by the
Electronic Case Filing System.

Pleadings ("Pl. Mem."), Dkt. No. 15-1.  The Commissioner cross-moved for judgment

on the pleadings with supporting papers on April 27, 2021.  Cross-Motion for

Judgment on the Pleadings, Dkt. No. 17; Memorandum of Law in Support of

Defendant's Cross-Motion for Judgment on the Pleadings and in Opposition to

Plaintiff's Motion ("Def. Mem."), Dkt. No. 18.  Shaw filed her reply papers on May

18, 2021.  Plaintiff's Reply in Support of Plaintiff's Motion ("Pl. Reply"), Dkt. No. 19.

The parties consented to my jurisdiction on March 10, 2021.  Dkt. No. 16.

### B. Administrative Record

#### 1. Shaw's Background

Shaw was born on January 12, 1954.  AR at 209.  At the time of the hearing,

she was 65 years old and lived alone in Manhattan.  *Id*. at 23.[3]  She has an eighth-

grade education.  *Id*. at 51.  Prior to the alleged disability onset date, Shaw worked

as a hotel housekeeper for 24 years until September 21, 2015.  *Id*.  She has not

worked since.  *Id*.

During the hearing, Shaw testified that she suffers from pain in her lower

back and left knee, which limits her ability to stand, walk, lift, bend, and carry

objects.  *Id*. at 52–53.  Shaw also testified that her knee frequently buckles, causing

---

[3] Shaw has since reached her retirement age, as defined in 20 C.F.R. § 404.409,
when she turned 66 on January 12, 2020.  As such, if found disabled, she would only
be entitled to disability benefits until December 12, 2019.  *See, e.g.*, *Shapiro v. Saul*,
No. 19-CV-8161 (AJN) (JLC), 2021 WL 140863 at *19 (S.D.N.Y. Jan. 8, 2021)
*adopted sub nom. Shapiro v. Comm'r of Soc. Sec.*, 2021 WL 797949 (Feb. 26, 2021)
("'[B]enefits cannot begin earlier than the first month following [the five-month
waiting period]' and benefits end '[t]he month before the month [the claimant]
attain[s] full retirement age.'  (quoting 20 C.F.R. § 404.315)).

her to fall.  *Id.* at 54–55.  As a result of her disability, she explained that she is unable to cook, clean, or carry groceries back from the grocery store, relying on the store's delivery services.  *Id.* at 54–56.  She testified that she is able to prepare cereal for herself, but because she cannot cook, her daughter either drops off food for her or she gets food from a center located in her living complex.  *Id.* at 56–57.

### 2.  Relevant Medical Evidence

#### a.    Treatment History

##### i.      Mark McMahon, M.D. – Orthopedic Surgeon

Dr. Mark McMahon treated Shaw for low back pain and issues with her left thigh and knee from February 2010 to July 2016.  *Id.* at 366, 432–51.  Dr. McMahon first referred Shaw for an MRI, which was conducted on February 24, 2010 and revealed a left knee effusion and left greater trochanteric bursitis.  *Id.* at 366.[4] Following a visit to the emergency room on January 21, 2015, Shaw returned to Dr. McMahon on January 30, 2015 due to pain in her left thigh, left knee, low back and difficulty climbing stairs.  *Id.* at 349–50.  During this visit, Dr. McMahon noted that Shaw's left knee flexion went to 85 degrees, she had patellar sensitivity, left thigh tenderness, and left thigh pain with hip flexion.  *Id.* at 350.

When Shaw reported back to him on April 3, 2015 for the same reasons as the previous visit, Dr. McMahon found her left knee reached 75 degrees with pain

---

[4] Trochanteric bursitis is a common cause of lateral hip pain that occurs when the bursa (a small fluid-filled sac) of the hip becomes inflamed.  Aaron J. Seidman & Matthew Varacallo, *Trochanteric Bursiti*s, NATIONAL CENTER FOR BIOTECHNOLOGY Informationhttps://www.ncbi.nlm.nih.gov/books/NBK538503/ (last visited Aug. 6, 2021).

and that she had patella sensitivity. *Id.* at 346–47. Shaw returned to Dr. McMahon on April 6, 2015 for a medial meniscus tear and chondromalacia of the knee after her thigh problem caused her to fall a few days prior. *Id.* at 340–41.[5] Dr. McMahon observed that her left knee flexion went to 90 degrees, and that both her knees were swollen and abnormal. *Id.* at 341. Dr. McMahon then referred her for an MRI of the left thigh, which took place on April 10, 2015 and revealed intact thigh musculature as well as the possibility of an unencapsulated lipoma. *Id.* at 343–44.

Shaw reported back to Dr. McMahon on October 6, 2015 due to left knee and thigh pain. *Id.* at 335–36. Dr. McMahon observed crepitus, tenderness, and instability. *Id.* at 336.[6] He found her left knee flexion went from 10 to 60 degrees and that she was unable to return to work due to her left knee, left thigh, and low back pain. *Id.* Shaw reported back to Dr. McMahon on November 30, 2015 due to a tear of the medial meniscus. *Id.* at 331. Dr. McMahon found atrophy of the left thigh, left knee flexion of 90 degrees, and permanent impairment. *Id.* at 332.

Shaw returned to Dr. McMahon on May 13, 2016 because her knee had buckled recently and she had ongoing pain in her left thigh and knee. *Id.* at 328–

---

[5] Menisci are crescent-shaped bands of thick, rubbery cartilage attached to the shinbone. The medial meniscus is located on the inner side of the knee joint. *Medial and Lateral Meniscus Tears*, CEDARS-SINAI, https://www.cedars-sinai.org/health-library/diseases-and-conditions/m/medial-and-lateral-meniscus-tears.html (last visited Aug. 6, 2021).

[6] Crepitus refers to the crackling, crunching, grinding or grating noise that accompanies flexing a joint. *Word: Crepitus*, CEDARS-SINAI (Feb. 17, 2020), https://www.cedars-sinai.org/discoveries/crepitus.html.

29.  Dr. McMahon noted that her left knee flexion went to 90 degrees with pain, patellar sensitivity, and thigh tenderness, and he concluded that she was 100% impaired and, thus, could not return to work.  *Id.* at 329.  Shaw returned to Dr. McMahon on July 28, 2016 due to ongoing pain in her left thigh and knee as well as her difficulty with using stairs.  *Id.* at 325–26.  Dr. McMahon noted that her left thigh and knee were shrinking.  *Id.* at 326.  He also found her left knee flexion went to 90 degrees with pain and tenderness in the left thigh and that she was 100% impaired, making her unable to return to work.  *Id.*

### ii.  Emergency Room, Mount Sinai St. Luke's

On January 21, 2015, Shaw visited the emergency room at Mount Sinai St. Luke's after hearing a snap in her leg that was followed by pain in her left thigh and knee.  *Id.* at 368.  The attending radiologist, Dr. Carol L. Hilfer, noted tenderness of the lower anterior thigh on palpation.  *Id.*  The imaging studies conducted also revealed that there was a sizeable suprapatellar knee joint effusion; mild narrowing of the medial knee joint compartment with medial, lateral, and tibial spine spurring; a flange of bone at the lateral tibia presumed hypertrophic; degenerative cysts in the left femoral neck; minimal hypertrophy at the lateral acetabulum and femoral head neck juncture; and large spherical calcification in the right pelvis which was presumed to be a uterine myoma.  *Id.*  Shaw was

consequently diagnosed with a knee ligament injury and degenerative joint disease. *Id.* at 370, 632.  She was prescribed Percocet for the pain.  *Id.* at 623.[7]

### iii.    Michael Hearns, M.D. – Physician

On August 1, 2015, Dr. Michael Hearns treated Shaw for pain in her low back, left thigh and knee after she fell and hit a bed frame at work.  *Id.* at 356.  She complained of left thigh numbness, burning, and a "dead sensation" which is aggravated by walking and prolonged sitting.  *Id.*  She indicated that she had difficulty climbing stairs and that her left knee was buckling.  *Id.*  She said that her left knee had not been the same since she fell in January 2015 due to the buckling, which would cause her to fall.  *Id.*  In assessing Shaw's back, Dr. Hearns reported that she had positive straight leg raise bilaterally that was greater on the left side. *Id.* at 357.  He also reported that Shaw had muscle spasm and tenderness in her back as well as a limited range of motion to 38 degrees of flexion and 0 degrees of extension.  *Id.*  In observing her left leg, he noted that she had decreased sensation in her left thigh and her left knee was positive for popliteal cyst, anterior drawer sign, McMurray sign, crepitus, effusion, and joint line tenderness.  *Id.*  Dr. Hearns also noted that she had limited flexion of her left knee to 80 degrees and 5 degrees of extension.  *Id.*  Deep tendon reflexes were 0/2 in her right leg and 2+ in the left lower extremity.  *Id.*  He observed 4/5 motor strength in the left lower extremity.

---

[7] Percocet is the brand name of an oxycodone and acetaminophen combination and is used to relieve pain severe enough to require opioid treatment. *Oxycodone And Acetaminophen (Oral Route),* MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/oxycodone-and-acetaminophen-oral-route/description/drg-20074000 (last visited Aug. 6, 2021).

*Id.* Dr. Hearns then ordered an MRI of the lumbar spine and an x-ray of the lumbar spine, left knee, and left hip. *Id.* at 358.

### iv.   Jotir Ramnarine, M.D. – Physician, Internal

On May 18, 2016, Shaw had an annual exam with Dr. Jotir Ramnarine. *Id.* at 453. Shaw reported fluctuating pain in her left knee, which was aggravated by movement. *Id.* at 453–54. A review of systems was positive for arthralgias. *Id.* at 454.[8] Upon examination, Shaw exhibited mild tenderness in her left knee, as well as a decreased range of motion. *Id.* at 456. She had a follow-up visit with Dr. Ramnarine on August 24, 2016 to address her asthma; the pain in her low back and left leg were not addressed in this visit. *Id.* at 476–77. Shaw returned to Dr. Ramnarine for her annual exam on October 26, 2017. *Id.* at 470. She reported that her chronic knee pain improved over time but was still a 6 out of 10 and worsened with exercise. *Id.* at 471. She also stated that she had to take her time moving to avoid falling due to weakness of the legs. *Id.* A review of systems was positive for arthralgias and a gait problem. *Id.*[9]

---

[8] Arthralgia is inflammation or pain from within the joint itself. *Joint Pain*, MAYO CLINIC, https://www.mayoclinic.org/symptoms/joint-pain/basics/definition/sym-20050668 (last visited Aug. 6, 2021).

[9] A review of systems is a "list of questions, arranged by organ system, designed to uncover dysfunction and disease within that area." *Adult Review of Systems (ROS)*, UC SAN DIEGO SCHOOL OF MEDICINE, https://meded.ucsd.edu/clinicalmed/ros.html (last visited Aug. 6, 2021).

Shaw returned to Dr. Ramnarine on October 29, 2018.  *Id.* at 516.  During this visit, she reported that she had fallen on October 23, 2018 while walking.  *Id.* at 505.  She landed on concrete and reported mild, left hand pain and right-sided rib pain.  *Id.*  Ice provided moderate relief.  *Id.*  Shaw exhibited musculoskeletal tenderness, and, in her left knee, decreased range of motion, swelling, effusion, and bony tenderness.  *Id.* at 508.  She also had a decreased range of motion, tenderness, and bony tenderness in her left hand.  *Id.* at 508.

Shaw returned to Dr. Ramnarine on September 5, 2019 for chronic left-sided low back pain.  *Id.* at 531.  A review of systems was positive for back pain.  *Id.* at 533.

### v.     Stephen Roberts, M.D. – Physician

On August 11, 2016, Shaw saw Dr. Stephen Roberts for pain in her left knee.  *Id.* at 637.  To provide increased support of the knee, Dr. Roberts prescribed a brace.  *Id.*  On September 7, 2016, Shaw returned to Dr. Roberts for a follow-up visit at which she complained of numbness and pain in her left lower extremity and pain in her knee and back.  *Id.* at 360–62.  Dr. Roberts found positive straight leg raise, muscle spasm, muscle tenderness, and limited range of motion.  *Id.* at 360.  Her left thigh exhibited decreased sensation.  *Id.*  Her left knee had a cyst positive anterior drawer, positive McMurray's test, crepitus, effusion, and joint line tenderness.  *Id.*  She had motor strength of four out of five and decreased sensation in the left lower extremity.  *Id.*  Deep tendon reflexes were 0/2 for the right and 2+/2 for the left

lower extremity.  *Id.*  He diagnosed back pain, lumbago, and left lower extremity

internal derangement.  *Id.* at 361.

### vi.    Harold Avella, M.D. – Physician

On September 8, 2016, Dr. Harold Avella performed nerve conduction

velocity and electromyography testing on Shaw's lower extremities due to back pain

that radiated into the left lower leg.  *Id.* at 642.[10]  Evaluation of the left tibial motor

and the right tibial motor nerves showed reduced amplitude.  *Id.*  The study showed

distal axonal neuropathy of bilateral tibial motor nerves.  *Id.*[11]  There was no

electrodiagnostic evidence of lumbar radiculopathy.  *Id.*

### vii.    Pierce Ferriter, M.D. – Orthopedic Surgeon

On December 16, 2016, Dr. Pierce Ferriter conducted an orthopedic

independent medical evaluation.  *Id.* at 647.  During this visit, Shaw stated that she

required the use of a cane and knee brace.  *Id.* at 648.  She also stated that she can

---

[10] "A nerve conduction velocity (NCV) test measures how fast an electrical impulse moves through [a] nerve" and is used to differentiate between a nerve disorder and a muscle disorder.  *Nerve Conduction Studies*, JOHNS HOPKINS MEDICINE, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/nerve-conduction-studies (last visited Aug. 6, 2021).

Electromyography testing assesses "the health of muscles and the nerve cells that control them."  *Electromyography (EMG)*, MAYO CLINIC, https://www.mayoclinic.org/tests-procedures/emg/about/pac-20393913 (last visited Aug. 6, 2021).

[11] "Tibial neuropathy occurs when the radial nerve is damaged or pinched, due to trauma . . . , certain prolonged repetitive motions, or other conditions (like diabetes or arthritis)."  *Tibial Neuropathy*, MEDSTAR WASHINGTON HOSPITAL CENTER, https://www.medstarwashington.org/our-services/pain-management/conditions/nervous-conditions/tibial-neuropathy/ (last visited Aug. 6, 2021).

only walk one block and sit for one hour before changing positions because of pain.
*Id.*  She reported pain in her low back, left hip, and left knee.  *Id.*  She also reported
stiffness and pinching in the lower back.  *Id.* at 649.  Dr. Ferriter observed mild
tenderness to palpation of the lumbar spine.  *Id.* at 650–51.  A test of her active
range of motion of the lumbar spine revealed flexion at 50 degrees and extension at
20 degrees, and right and left lateral flexion both at 20 degrees.  *Id.* at 650.  In
inspecting the left hip, there was tenderness upon palpation of the lateral hip at the
greater trochanter.  *Id.* at 651.  A test of her active range of motion of the left lateral
hip revealed abduction at 40 degrees, adduction at 30 degrees, and both external
and internal rotation at 40 degrees.  *Id.*  She had tenderness to palpation of the left
knee and exhibited crepitus in the patella femoral joint.  *Id.*  Lastly, Dr. Ferriter
found that Shaw had a sprain/strain of the lumbar spine and left hip trochanteric
bursitis.  *Id.*

### viii.   Home Physical Therapy Solutions, P.C.

Shaw was seen for physical therapy from November 21, 2017 to December 28,
2017.  *Id.* at 409–24 .  During Shaw's initial physical therapy evaluation with Farid
Arroyave, M.S.P.T. on November 21, 2017, Shaw exhibited an antalgic gait with
decreased weight acceptance of the left lower extremity.  *Id.* at 409–12.  Shaw
complained of difficulty walking due to left knee pain, weakness, and buckling.  *Id.*
at 409.  She stated that her symptoms were exacerbated by standing for extended
periods and when climbing stairs.  *Id.*  She also stated that she was unable to stand
for more than five minutes without significant pain, walk for more than five

minutes without aggravating pain, or climb more than half of a flight of stairs without aggravating pain. *Id.* Shaw's right knee active flexion was to 140 degrees, but her left was only to 95 degrees. *Id.* at 410. Her right knee had 3+/5 gross strength for flexion and extension, but her left knee had 3-/ and 3/5 respectively. *Id.* Shaw's left knee had passive range of motion to 115 degrees of flexion. *Id.* In addition, an Apley's compression test was positive with pain, a patellar grind test was positive, and a medial joint line test revealed tenderness during palpation. *Id.*[12] In addition, a lower extremity function scale resulted in a score of 20 and impairment of 75. *Id.* at 412.

On November 27, 2017, Shaw attended physical therapy where she fatigued quickly with stabilization exercises and the physical therapist noted swelling in her left knee. *Id.* at 413–14. On November 29, 2017, Shaw returned to physical therapy and reported difficulty with walking and climbing stairs. *Id.* at 415. Swelling was noted on the left knee but seemed to decrease after treatment. *Id.* at 416.

On December 4, 2017, Shaw returned to physical therapy. *Id.* at 417. Her left knee was swollen. *Id.* She rated her left knee pain a 7/10 and reported she was unable to stand without significant pain for greater than ten minutes. *Id.* She also reported that she was unable to climb more than half a flight of stairs or to walk for greater than five minutes without aggravating pain. *Id.*

---

[12] The Apley's compression test is used to evaluate meniscus injuries. *Apley Grind Test*, NATIONAL CENTER FOR BIOTECHNOLOGY INFORMATION, https://www.ncbi.nlm.nih.gov/books/NBK470549/ (last visited Aug. 6, 2021).

When she returned for physical therapy on December 13, 2017, the swelling in her left knee persisted. *Id.* at 421. She reported stiffness in her left knee due to cold weather and pain that she rated a 6/10. *Id.* On December 18, 2017, her swelling and pain remained the same, but she reported that she could walk for twenty minutes. *Id.* at 423. At her physical therapy session a couple days later, she was able to stand and walk for 20 minutes but still had difficulty climbing stairs. *Id.* at 425. She expressed concerns about being able to perform her daily living activities. *Id.* She rated her left knee pain a 5–6/10. *Id.* She was still unable to climb less than one flight of stairs without aggravating pain. *Id.* Her gait was antalgic and showed decreased weight acceptance of the left lower extremity. *Id.* Shaw's active range of motion for her left knee was 110 degrees of flexion and the gross strength was 3+/5 for flexion and extension. *Id.* Her physical therapist further recorded a passive range of motion in her left knee of 120 degrees. *Id.* at 426. She had positive findings for Apley's compression with pain and a positive patellar grind test. *Id.* at 426. There was decreased tenderness to palpitation of the medial joint line. *Id.* She exhibited weakness and decreased balance and stability on her left lower extremity compared to her right. *Id.* The impairment caused difficulty getting up from chairs, climbing stairs, and walking for extended periods of time. *Id.* Shaw's lower extremity function scale results were 29 and impairment 64. *Id.* at 427.

On December 27, 2017, Shaw returned to physical therapy and reported knee stiffness due to the cold weather. *Id.* at 428. She rated her left knee pain a 6/10

and moderate swelling was noted on the left knee.  *Id.*  She returned to physical therapy the next day and reported unchanged symptoms.  *Id.* at 430.  Her physical therapist noted moderate swelling in her left knee.  *Id.*

### ix.      Tonda Hill, M.D. – Physician, Internal Medicine

On July 17, 2019, Dr. Tonda Hill treated Shaw for chronic midline low back pain.  *Id.* at 529.  Shaw stated that the pain was left sided, began in her hip and traveled down her posterior thigh.  *Id.* at 517.  Dr. Hill assessed chronic midline low back pain without sciatica and ordered x-rays.  *Id.*  X-rays of the lumbar spine revealed grade 1 anterolisthesis at L4–L5 which progressed since 2006 and mild dextroscoliosis was redemonstrated.  *Id.* at 563.

### x.       Eric Wood, P.A. – Physician Assistant, Family Medicine

On August 3, 2019, Eric Wood, P.A. treated Shaw for chronic low back pain.  *Id.* at 526.  A review of systems was positive for back pain and myalgias.  *Id.* at 527.[13]  An examination of her lumbar back revealed a decreased range of motion.  *Id.* at 528.  PA Wood assessed chronic midline back pain and referred her to physical therapy.  *Id.* at 529.

---

[13] Myalgia describes muscle aches and pain, which can involve ligaments, tendons and fascia.  *Myalgia*, JOHNS HOPKINS MEDICINE, https://www.hopkinsmedicine.org/health/conditions-and-diseases/myalgia (last visited Aug. 6, 2021).

### b. Opinion Evidence

#### i. Mark McMahon, M.D. – Orthopedic Surgeon

During Shaw's January 30, 2015 visit with Dr. McMahon, he indicated that Shaw was 100% temporarily impaired, but could return to work on February 8, 2015. *Id.* at 345, 350. On April 3, 2015 and April 7, 2015, he stated that Shaw was 0% temporarily impaired. *Id.* at 341, 347. On October 6, 2015, he indicated that Shaw was 0% temporarily impaired but was unable to return to work due to pain in the lower back, left knee, and left thigh. *Id.* at 434. On December 1, 2015, Dr. McMahon indicated that Shaw was permanently impaired 40% in her left knee. *Id.* at 436. Then on May 13, 2016, he noted that Shaw was 100% temporarily impaired and unable to return to work due to left thigh and knee pain. *Id.* at 439. Dr. McMahon again indicated on July 28, 2016 that Shaw was 100% temporarily impaired and unable to return to work due to left thigh and knee pain. *Id.* at 441.

#### ii. Michael Hearns, M.D. – Physician, Internal Medicine

On August 1, 2015, Dr. Hearns observed that Shaw's restrictions included "[l]ifting, pushing, pulling, carrying, prolonged siting, standing, walking, climbing, kneeling, bending, repetitive motion, and operating machinery." *Id.* at 358.

#### iii. Stephen Roberts, M.D. – Physician

On September 7, 2016, Dr. Roberts recorded restrictions with "[l]ifting, pushing, pulling, carrying, sitting, standing, walking, climbing, kneeling, bending, repetitive motion, and operating machinery." *Id.* at 361.

#### iv. Harold Avella, M.D. – Physician

15

On September 15, 2016, Dr. Avella evaluated Shaw's back pain for Workers' Compensation and indicated that she was 75% impaired. *Id.* at 355.

### v.     Pierce Ferriter, M.D. – Orthopedic Surgeon

On December 16, 2016, Dr. Ferriter evaluated Shaw's left knee for Workers' Compensation. *Id.* at 647. He noted that Shaw's bilateral knee ranges were identical and indicated that she had a 0% scheduled loss of use of the left knee. *Id.* at 652.

### vi.     Aurelio Salon, M.D. – Physician, Internal Medicine

On March 15, 2017, Dr. Aurelio Salon performed a consultative internal medicine examination of Shaw at the request of the Division of Disability Determination. *Id.* at 377. Dr. Salon observed that Shaw did not appear to be in acute distress and that her gait was normal. *Id.* at 378. Dr. Salon also noted that Shaw could walk on her toes and heels without difficulty and could squat fully. *Id.* In addition, he found no basis to restrict her ability to sit, stand, climb, push, pull, or carry heavy objects. *Id.* at 379. An x-ray of the left knee revealed moderate medial degenerative joint disease with joint space narrowing and osteophyte formation. *Id.* at 381. An x-ray of the lumbosacral spine did not reveal any significant bony abnormality. *Id.* at 380.

### 3.  Hearing Before the ALJ

Represented by counsel, Shaw testified in person in Falls Church, Virginia before ALJ Hunt on October 15, 2019. AR at 46–64. Testimony was also taken from Vocational Expert ("VE") Sara Statz. *Id.* at 64–79.

16

Shaw testified that prior to her disability onset date of September 21, 2015, she worked as a housekeeper in a hotel for 24 years, where she cleaned hotel rooms, pushed a 500-pound cart, and lifted king size mattresses to change their sheets. *Id.* at 51–52. She represented that she had to bend down to clean each room. *Id.* at 52. Shaw testified that she had to go on modified duty often because she could not perform her duties properly and could not climb the stairs to different floors. *Id.* at 58–59. She also stated that she can no longer perform that job due to pain in her lower back and knees. *Id.* at 53. For these reasons, she eventually quit her job. *Id.* at 59.

Shaw testified that she was living alone at the time of her hearing. *Id.* at 50. Shaw explained that she is unable to cook, clean, or carry groceries back from the grocery store, relying on the store's delivery services or sometimes ordering her groceries online. *Id.* at 55–57. She stated that she can lift a gallon of milk if she uses two hands to do so, but that lifting off of the floor would cause a lot of pain. *Id.* at 55–56. She testified that she is able to prepare cereal for herself, but because she cannot cook, her daughter either drops off food for her or she gets food from the center located in her living complex. *Id.* at 57. Shaw testified that she is unable to wash dishes, sweep, mop, or vacuum. *Id.* at 60–61.

Shaw testified that she suffers primarily from pain in her lower back and knee, which limits her ability to stand, walk, lift and carry objects. *Id.* at 53. Shaw also testified that her knee buckles around six times a month, depending on how

17

often she is on her feet, causing her to fall. *Id.* at 54–55. She stated that she can stand for 15 minutes at a time due to pain. *Id.* at 57.

VE Statz testified that Shaw's past work was that of a cleaner/housekeeper (DOT 323.687-014). *Id.* at 65. She opined that a hypothetical person with Shaw's age, education, vocational profile, and work history could perform medium work with the following limitations: frequently can balance, crouch, kneel, crawl, stoop, and climb ramps, stairs, ladders, and scaffolds; frequently can push, pull, reach, handle, finger, and feel with the left upper extremity; frequently can push, pull, and operate foot controls with the right lower extremity and occasionally with the left lower extremity; no concentrated exposure to fumes, dust, odors, gases, poor ventilation, and other pulmonary irritants; no exposure to hazards, such as unprotected heights and machines with moving, mechanical parts. *Id.* at 65–66. Statz also opined that a hypothetical person with Shaw's age, education, vocational profile, and work history could not perform Shaw's previous work as a housekeeper if they needed to be off task 10% of the day due to alternating between sitting and standing positions. *Id.* at 66.

## II. DISCUSSION

### A. Legal Standards

#### 1. Judicial Review of Commissioner's Determinations

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g) (2018). The district court must

determine whether the Commissioner's final decision applied the correct legal standards and whether it is supported by substantial evidence. *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations . . . . whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938))).

The substantial evidence standard is a "very deferential standard of review." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012). The Court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted). "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)).  On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing." 42 U.S.C. § 405(g) (2018).  However, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard, [the court has], on numerous occasions, remanded to the [Commissioner] for further development of the evidence." *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)) (alteration in original).

### 2.  Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (2018); *accord* 42 U.S.C. § 1382c(a)(3)(A) (2018). Physical or mental impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and

work experience, engage in any other kind of substantial gainful work which exists

in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In assessing a claimant's impairments and determining whether they meet

the statutory definition of disability, the Commissioner "must make a thorough

inquiry into the claimant's condition and must be mindful that 'the Social Security

Act is a remedial statute, to be broadly construed and liberally applied.'"  *Mongeur*,

722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)).

Specifically, the Commissioner's decision must take into account factors such as:

"(1) the objective medical facts; (2) diagnoses or medical opinions based on such

facts; (3) subjective evidence of pain or disability testified to by the claimant or

others; and (4) the claimant's educational background, age, and work experience."

*Id.* (citations omitted).

### a.   Five-Step Inquiry

"The Social Security Administration has outlined a 'five-step, sequential

evaluation process' to determine whether a claimant is disabled[.]"  *Estrella v.*

*Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019) (citations omitted); 20 C.F.R. §

404.1520(a)(4) (2020).  First, the Commissioner must establish whether the

claimant is presently employed.  20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is

unemployed, the Commissioner goes to the second step and determines whether the

claimant has a "severe" impairment restricting her ability to work.  20 C.F.R. §

404.1520(a)(4)(ii).  If the claimant has such an impairment, the Commissioner

moves to the third step and considers whether the medical severity of the

21

impairment "meets or equals" a listing in Appendix One of Subpart P of the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is considered disabled. *Id.*; 20 C.F.R. § 404.1520(d). If not, the Commissioner continues to the fourth step and determines whether the claimant has the residual functional capacity ("RFC") to perform her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Finally, if the claimant does not have the RFC to perform past relevant work, the Commissioner completes the fifth step and ascertains whether the claimant possesses the ability to perform any other work. 20 C.F.R. § 404.1520(a)(4)(v).

The claimant has the burden at the first four steps. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). If the claimant is successful, the burden shifts to the Commissioner at the fifth and final step, where the Commissioner must establish that the claimant has the ability to perform some work in the national economy. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b.   Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000). Consequently, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks omitted). As part of this duty, the ALJ must "investigate the facts and develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at 111. Specifically, under the applicable regulations, the ALJ is required to develop a

claimant's complete medical history.  *Pratts*, 94 F.3d at 37 (citing 20 C.F.R. §§

404.1512(d)–(f) (2020)).  This responsibility "encompasses not only the duty to

obtain a claimant's medical records and reports but also the duty to question the

claimant adequately about any subjective complaints and the impact of the

claimant's impairments on the claimant's functional capacity."  *Pena v. Astrue*, No.

07-CV-11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations

omitted).

Whether the ALJ has satisfied this duty to develop the record is a threshold

question.  Before determining whether the Commissioner's final decision is

supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be

satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's

regulations' and also fully and completely developed the administrative

record."  *Scott v. Astrue*, No. 09-CV-3999 (KAM) (RLM), 2010 WL 2736879, at *12

(E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685

F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart*, No. 02-CV-5782 (FB),

2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to

fully develop the record is a bedrock principle of Social Security law." (citing *Brown

v. Apfel*, 174 F.3d 59 (2d Cir. 1999))).  The ALJ must develop the record even where

the claimant has legal counsel.  *See, e.g., Perez v. Chater*, 77 F.3d 41, 47 (2d Cir.

1996).  Remand is appropriate where this duty is not discharged.  *See, e.g., Moran*,

569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported

23

by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

### c.   Claimant's Credibility

An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court.  *Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006).  "[A]s with any finding of fact, '[i]f the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints." *Id.* (quoting *Aponte v. Sec'y of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)). Still, an ALJ's finding of credibility "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record."  *Pena*, 2008 WL 5111317, at *10 (internal quotation marks omitted) (quoting *Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988)).  "The ALJ must make this [credibility] determination 'in light of the objective medical evidence and other evidence regarding the true extent of the alleged symptoms.'"  *Id.* (quoting *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)).

SSA regulations provide that statements of subjective pain and other symptoms alone cannot establish a disability.  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)).  Accordingly, the ALJ must follow a two-step framework for evaluating allegations of pain and other limitations.  *Id.*  First, the ALJ considers whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged.

24

*Id.* (citing 20 C.F.R. § 404.1529(b)).  "If the claimant does suffer from such an

impairment, at the second step, the ALJ must consider 'the extent to which [the

claimant's] symptoms can reasonably be accepted as consistent with the objective

medical evidence and other evidence' of record."  *Id.* (citing 20 C.F.R. § 404.1529(a)).

Among the kinds of evidence that the ALJ must consider (in addition to objective

medical evidence) are:

> 1. The individual's daily activities; 2. [t]he location,
> duration, frequency, and intensity of the individual's pain
> or other symptoms; 3. [f]actors that precipitate and
> aggravate the symptoms; 4. [t]he type, dosage,
> effectiveness, and side effects of any medication the
> individual takes or has taken to alleviate pain or other
> symptoms; 5. [t]reatment, other than medication, the
> individual receives or has received for relief of pain or
> other symptoms; 6. [a]ny measures other than treatment
> the individual uses or has used to relieve pain or other
> symptoms (e.g., lying flat on his back, standing for 15 to
> 20 minutes every hour, or sleeping on a board); and 7.
> [a]ny other factors concerning the individual's functional
> limitations and restrictions due to pain or other
> symptoms.

*Pena*, 2008 WL 5111317, at *11 (citing SSR 96-7p, 1996 WL 374186, at *3 (SSA July

2, 1996)).

## B. The ALJ's Decision

In his December 4, 2019 decision, the ALJ concluded that Shaw was not

disabled as defined by the Social Security Act.  AR at 30.  Following the five-step

inquiry, at step one, the ALJ found that Shaw was not engaged in substantial

gainful activity from her onset date of September 21, 2015.  *Id.* at 20.  At step two,

the ALJ found that Shaw had severe impairments of degenerative joint disease of

the left knee, left hip bursitis, degenerative disc disease of the lumbar spine with

dextroscoliosis, and grade 1 anterolisthesis at L4-5. *Id.* At step three, the ALJ

found that none of Shaw's impairments met or equaled the severity of the listings.

*Id.* at 22. Specifically, he found that there was no evidence of a severe spine

disorder or major dysfunction of a joint. *Id.*

Prior to evaluating step four, the ALJ determined Shaw's RFC. *Id.* He

concluded that Shaw could perform "medium work" with the following exceptions:

she can balance, crouch, kneel, crawl, stoop, and climb ramps, stairs, ladders, ropes,

or scaffolds frequently; she can push, pull, reach, handle, finger, and feel with the

left upper extremity frequently; she can push, pull, and operate foot controls with

the right lower extremity frequently and occasionally with the left lower extremity;

she should avoid concentrated exposure to fumes, dust, odors, gases, poor

ventilation, and other pulmonary irritants; she should avoid exposure to hazards

such as unprotected heights and machines with moving mechanical parts; and, she

will be off task 10% of the day, due to, for example, alternating between sitting and

standing positions. *Id.* In formulating the RFC, the ALJ evaluated Shaw's

testimony and determined that her "medically determinable impairments could

reasonably be expected to cause the alleged symptoms; however, the claimant's

statements concerning the intensity, persistence, and limiting effects of these

symptoms are not entirely consistent with the medical evidence and other evidence

in the record." *Id.* at 23.

26

The ALJ provided several reasons for his RFC finding, including that Shaw did not undergo surgery, request prescription medication to address her pain, or agree to receive back injections. *Id.* at 24–25. In addition, the ALJ found that Shaw reported having mild pain in May 2016 and had mostly normal or minimally abnormal findings on many occasions. *Id.* at 24–25. Moreover, the ALJ noted that after seeing improvements, Shaw stopped going to physical therapy. *Id.* at 25.

The ALJ also summarized Shaw's treatment history and weighed the opinions of medical sources to reach his RFC finding. *Id.* at 26–29. The ALJ gave "some weight" to the opinions of Dr. Hearns and Dr. Roberts that Shaw is limited in her ability to perform particular work activities, but "little weight" to their opinions that Shaw is "limited in her ability to lift, push, pull, carry, climb, kneel, bend, operate machinery, perform repetitive motions, and perform prolonged sitting, standing and walking." *Id.* at 28. He reasoned that their opinions are "of limited usefulness" in determining disability under the Social Security Act because they did not "precisely quantify" Shaw's ability to perform particular basic work activities. *Id.*

Even though the ALJ noted that Dr. McMahon's observations provided support for his opinions, the ALJ gave "little weight" to his opinion that Shaw was "unable to return to work, or unable to perform her past work or any other work as a result of her impairments." *Id.* at 26. The ALJ also gave "little weight" to Dr. McMahon's opinion that Shaw had a "loss of use rating totaling 40% for her left lower extremity impairments." *Id.* He reasoned that because Dr. McMahon's

27

opinions failed to identify any specific restrictions of Shaw's ability to perform particular work activities, they were of "little usefulness" in assessing disability.  *Id.* at 27.  Additionally, the ALJ found that Dr. McMahon's opinions were "overly restrictive" given that Shaw had rated her knee pain as "mild" in May 2016.  *Id.*

The ALJ also assigned "little weight" to Dr. Avella's opinion that Shaw had a temporary impairment rating of 75% based on her back impairment.  *Id.*  The ALJ reasoned that Dr. Avella's opinion was "overly restrictive" because images of Shaw's lumbar spine revealed signs of only "mild" dextroscoliosis, with no spondylosis and only grade 1 anterolisthesis.  *Id.*  The ALJ also gave "little weight" to Dr. Ferriter's opinion that Shaw had a 0% loss of use in her left knee.  *Id.*  He reasoned that Dr. Avella's finding was based on a standard used to assess worker's compensation claims, which is different from the standard used when considering Social Security claims.  *Id.*  Moreover, the ALJ found that Shaw's "left knee impairment contributes to some significant limitations of her ability to perform certain basic work activities."  *Id.*

The ALJ also gave "little weight" to Dr. Salon's opinion that Shaw "exhibited no objective findings that would support restrictions of her ability to sit, stand, climb, push, pull, or carry heavy objects."  *Id.*  The ALJ reasoned that Shaw's testimony and the medical evidence established that Shaw's impairments cause some significant limitations of her ability to perform certain basic work activities. *Id.* at 28.  Lastly, the ALJ gave "little weight" to the New York Workers' Compensation Board's determination that Shaw had been disabled for portions of

2015 and that she had a loss of use rating of 8.75% for her left lower extremity,

reasoning that the standard for determining disability for a workers' compensation

claim is different from that of a Social Security claim. *Id.*

At step four, the ALJ found that Shaw has the RFC to perform past relevant

work as a housekeeping cleaner. *Id.* at 29. Accordingly, the ALJ concluded that

Shaw was not disabled from September 21, 2015 through the date of his decision.

*Id.* at 30.

### C. Analysis

Shaw argues, *inter alia*, that the ALJ's RFC determination is not supported

by substantial evidence because the ALJ relied on Dr. Hearns' and Dr. Roberts'

opinions after acknowledging they were of "limited usefulness." Pl. Mem. at 14–16.

Instead, she contends, the ALJ should have further developed the record by re-

contacting her treating sources, ordering an additional consultative examination, or

requiring a medical expert to testify. *Id.* at 16. The Commissioner counters that

the ALJ fairly determined Shaw's RFC because he relied on evidence in the overall

record which contained adequate information to make the RFC determination. Def.

Mem. at 18.

"Social Security proceedings are inquisitorial rather than adversarial. It is

the ALJ's duty to investigate the facts and develop the arguments both for and

against granting benefits[.]" *Sims*, 530 U.S. at 110–11. As a result, "[i]t is the rule

in [the] [Second] [C]ircuit that the ALJ, unlike a judge in a trial, must herself

affirmatively develop the record in light of the essentially non-adversarial nature of

a benefits proceeding." *DeGraff v. Comm'r of Soc. Sec.*, 850 F. App'x 130, 131 (2d Cir. 2021) (quoting *Pratts*, 94 F.3d at 37).   "The rule remains that 'if a physician's finding in a report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician.'" *Donofrio v. Saul*, No. 18-CV-9968 (ER), 2020 WL 1487302, at *8 (S.D.N.Y. Mar. 27, 2020) (quoting *Calzada v. Asture*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010)).

Crucially, "[b]ecause an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." *Id.* (quoting *Hilsdorf v. Commissioner of Soc. Sec.*, 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010)); *Davis v. Comm'r of Soc. Sec.*, No. 5:16-CV-0657 (WBC), 2017 WL 2838162, at *7 (N.D.N.Y. June 30, 2017) ("[T]he ALJ committed error in weighing the evidence in the record and formulating an RFC determination because the ALJ improperly weighed medical opinions against her lay interpretation of [p]laintiff's [medical evidence].").   While an ALJ may choose to discount medical opinions when the record "contains sufficient evidence to permit [him] to render a common-sense RFC determination," *Morrill v. Saul*, No. 19-CV-6279 (LGF), 2020 WL 5107567, at *4 (W.D.N.Y. Aug. 31, 2020), the ALJ may only do so when "the medical records . . . show[] relatively minor impairments" and are not "disabling." *Dagonese v. Comm'r of Soc. Sec.*, No. 18-CV-1021 (MJR), 2020 WL 3046146, at *5 (W.D.N.Y. June 8, 2020).   Accordingly, the ALJ may not "render a

30

common-sense judgment about functional capacity" based on "complex medical findings." *Dale v. Colvin*, No. 15-CV-496 (FPG), 2016 WL 4098431, at *4 (W.D.N.Y. Aug. 2, 2016).

As previously noted, the ALJ gave "little weight" to almost all of the medical providers' opinions and observed that while Dr. Hearns' and Dr. Roberts' notes provided "some support"  for their opinions, they were ultimately of "limited usefulness."  AR at 28.  Despite having relied on almost no medical expert opinion, the ALJ nonetheless threaded together disparate medical notes and pieces of medical providers' opinions to justify his RFC determination.  After rendering this determination, the ALJ did not cite any medical provider opinion to support his findings, but proceeded to opine in conclusory fashion that his "assessment is further supported in part by the opinions of Dr. Roberts and Dr. Hearns."  AR at 29. Thus, the most weight the ALJ gave to medical provider opinions were to those of Dr. Hearns and Dr. Roberts, even though he had already largely dismissed them. AR at 28.

An ALJ has a duty to develop the record "even where the ALJ has access to treatment notes, test results, and other medical history."  *Thomas v. Saul*, No. 19-CV-6990 (MKV) (RWL), 2020 WL 5754672, at *9 (S.D.N.Y. July 24, 2020) (citations omitted), *adopted sub nom. Thomas v. Comm'r of Soc. Sec.*, 2020 WL 4731421 (Aug. 14, 2020).  After the ALJ concluded that the medical providers' opinions were deficient, he should have further developed the record, rather than making an RFC determination based on his own understanding of the medical evidence.  *See, e.g.,*

*Vellone on behalf of Vellone v. Saul*, No. 20-CV-261 (RA), 2021 WL 2801138, at *2
(S.D.N.Y. July 6, 2021) ("[A]n ALJ cannot make an RFC determination based solely
on information [in providers' treatment notes]."); *Donofrio*, 2020 WL 1487302, at *8
("In the absence of clarification from [medical provider] regarding his medical
opinion, the ALJ failed to support her RFC assessment with proper expert medical
evidence.").

The Commissioner's argument that the record as a whole supported the RFC
determination is unavailing.  Def. Mem. at 18.  For one, the RFC is a medical
determination, which the ALJ cannot make without support from medical providers'
opinions.  Second, the record contains instances in which there was evidence both
consistent with and contrary to the ALJ's RFC determination.  *See, e.g.*, AR at
350, 439, 441 (Dr. McMahon treatment records finding that Shaw was unable to
return to work and was 100% temporarily impaired on three occasions, ranging
from January 2015 to July 2016); *id.* at 379 (Dr. Salon finding no basis to restrict
her ability to sit, stand, climb, push, pull, or carry heavy objects).  At the very least,
the fact that the record, as limited as it was, contained inconsistencies, further
supports Shaw's contention that it should be further developed.  *See, e.g.*, *Ewen v.
Saul*, No. 19-CV-9394 (SLC), 2021 WL 1143288, at *11 (S.D.N.Y. Mar. 23, 2021)
("Ultimately, the record as a whole must be complete and detailed enough to allow
the ALJ to determine the claimant's residual functional capacity. When there are
inconsistencies, gaps, or ambiguities in the record, the regulations give the ALJ
options to collect evidence to resolve these issues . . . ." (internal quotation and

alteration omitted) (quoting *Casino-Ortiz v. Astrue,* No. 06-CV-155 (DAB) (JCF),
2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007) and citing 20 C.F.R. §§
404.1520b, 416.920(b))).

For these reasons, the ALJ's RFC determination was not supported by
substantial evidence and the case must be remanded.  *See, e.g.*, *Thomas*, 2020 WL
5754672, at *12 ("Legal errors regarding the duty to develop the record warrant
remand." (quoting *Wilson v. Colvin*, 107 F. Supp. 3d 387, 407 (S.D.N.Y. 2015));
*Staggers v. Colvin*, No. 14-CV-717 (SALM), 2015 WL 4751108, at *3 (D. Conn. June
17, 2015) ("An ALJ is not qualified to assess a claimant's RFC on the basis of bare
medical findings, and as a result an ALJ's determination of RFC without a medical
advisor's assessment is not supported by substantial evidence." (quoting *Deskin v.
Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008))), *adopted by* 2015
WL 4751123 (Aug. 11, 2015).[14]

---

[14] Shaw also argues that the case should be remanded because the ALJ's Step Four
determination is inconsistent with the vocational expert's testimony.  Pl. Mem. at
18–19.  However, in light of the Court's conclusion that the ALJ rendered his RFC
determination without fully developing the record, the Court need not reach the
issue.  Because "the ALJ's RFC determination was not supported by substantial
evidence, . . . the ALJ was not entitled to rely on the VE's testimony in response to
[his] hypothetical."  *Hofsommer v. Berryhill*, 322 F. Supp. 3d 519, 535 (S.D.N.Y.
2018); *see also Pickering v. Colvin*, No. 14-CV-6902 (RLE), 2016 WL 554589, at *14
(S.D.N.Y. Feb. 10, 2016) ("Based on the inadequate record before the Court, the
ALJ's reliance on the vocational expert . . . cannot be upheld.").

### III. CONCLUSION

For the foregoing reasons, Shaw's motion for judgment on the pleadings is granted and the Commissioner's cross-motion is denied. The case is remanded for further proceedings consistent with this Opinion. The Clerk of Court is respectfully directed to terminate the motions at Dkt. Nos. 15 and 17, and mark Dkt. No. 15 as "granted" and Dkt. No. 17 as "denied."

**SO ORDERED.**

Dated: August 11, 2021
  New York, New York

JAMES L. COTT
United States Magistrate Judge

34